## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

CASE NO.

TANGSHAN GANGLU
IRON & STEEL CO., LTD,

        Plaintiff

vs.

BECKER & POLIAKOFF, P.A. and PAMELA
ANSELMO,

        Defendants.

_____/

## COMPLAINT

Plaintiff Tangshan Ganglu Iron & Steel Co., Ltd., ("Tangshan Ganglu") sues Defendants Becker & Poliakoff, P.A. ("B&P") and Pamela Anselmo ("Anselmo"), and alleges:

## PARTIES, JURISDICTION, AND VENUE

1.    This is an action for legal malpractice and breach of fiduciary duty brought by a citizen and subject of China against citizens and permanent residents of the State of Florida, for damages exceeding $75,000.  Therefore this action is within the Diversity Jurisdiction of this Court pursuant to 28 U.S.C. Section 1332.

2.    Plaintiff Tangshan Ganglu is a foreign corporation with its principal address at Zhenhai Dong Jie, Zunhua City, Hebei Province, People's Republic of China.  It is a Chinese company engaged in the business of mining, iron making, steel making and other related businesses.  It is one of the top 500 companies in China, with over 10,000 employees.

3.    Tangshan Ganglu was founded by Zhen Zeng Du ("Mr. Du"), who is a resident of China.   Mr. Du is the Chairman of Tangshan Ganglu's Board of Directors.   Mr. Du controls

Tangshan Ganglu and related companies.

4. Defendant B&P is a Professional Association conducting the practice of law in the State of Florida and elsewhere, with its main offices in Fort Lauderdale, Florida.

5. Defendant Anselmo is an attorney admitted to the practice of law in Florida and is a resident of the State of Florida. At all material times, Anselmo was a partner and/or employee of B&P. In 2014, Anselmo left B&P and joined another law firm, Hinshaw & Culbertson. All of her actions alleged herein that occurred while she was employed by B&P were taken within the scope of her employment with B&P, and were performed as agent of B&P. B&P therefore is vicariously liable for Anselmo's conduct alleged herein.

6. Venue is proper in this Court.

7. All conditions precedent to the filing of this Action have occurred or been waived.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### THE PLAN TO REDEVELOP THE PLANTATION FASHION MALL

8. In 2004, Mr. Du became interested in investing in the United States, in order to open markets for Tangshan Ganglu in North and South America. Investment in the US also would enable him to emigrate to the United States through investment and US job creation, and thereby enable his children to be educated in the United States.

9. In 2004, Mr. Du was introduced to Wei Chen ("Chen"), a naturalized American citizen residing in Florida.

10. Chen was formerly a Chinese citizen named Yejun He. Upon information and belief, Yejun He fled to the United States in approximately May of 1999, just before a warrant was issued in China for his arrest for theft of substantial public funds. Once in the United States, he changed his name to Wei Chen, although he periodically continued to use the name Yejun He.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

11.     Mr. Du was unaware that Chen had formerly been known as Yejun He, and had no knowledge of Chen's criminal issues in China.

12.     Chen enticed Mr. Du to invest in real property known as the "Plantation Fashion Mall".  The Mall was a major regional retail mall and office building located in Plantation, Florida.

13.     In order to facilitate Mr. Du's investment in the Plantation Fashion Mall, in November 2004 Chen assisted Mr. Du in forming Mapuche Holdings, LLC, a Florida limited liability company ("Mapuche").

14.     As set forth more fully below, between the end of 2004 and late 2005, Chen encouraged Mr. Du and Tangshan Ganglu to deposit over $10 million into Mapuche, ostensibly for the purpose of covering Mapuche's investment in the Plantation Fashion Mall and its development.  In reality, however, Chen directed Mapuche's initial investment into US Capital Holdings, LLC ("Holdings"), a holding company that was one step removed from the title owner of the Plantation Fashion Mall and which was indirectly controlled by Chen.

15.     Through Jin Zhi Star (US) ("JZS (US)"), Chen (using the name of Yejun He), owned and controlled 51% of the membership interests in Holdings, which in turn was organized to be the sole member of US Capital/Fashion Mall, LLC ("Capital/Fashion"), which in turn was organized for the sole purpose of purchasing, owning and operating the Plantation Fashion Mall.

16.     In September 2004, with $35 million in financing and approximately $3 million in deposits funded by two Chinese individuals known to Chen, Capital/Fashion purchased the office tower and retail portions of the Plantation Fashion Mall.

17.     On January 21, 2005, with additional financing, the source of which  likely included Tangshan Ganglu as set forth more fully below, Jin Zhi Star LT, LLC ("JZS LT")

**LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP**
201 South Biscayne Boulevard, 22nd Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

purchased a parcel formerly occupied by Lord & Taylor at the Plantation Fashion Mall (the "Lord & Taylor space").  JZS LT also was an entity controlled by Chen (using the name of Yejun He).

18.     Mr. Du was told that the purpose of his initial investment was to redevelop the Mall and the Lord & Taylor space into a mixed-use project consisting of retail, office and residential space ("The 321 North Project").

19.     On November 30, 2004, Mr. Du directed Tangshan Ganglu to transfer funds totaling $1,790,497.20 to Mapuche, which Mr. Du understood were to be used to purchase the Plantation Fashion Mall.

20.     Throughout  2005, Tangshan Ganglu continued to periodically transfer funds to Mapuche for the purpose of purchasing the Plantation Fashion Mall and developing the 321 North Project.  From the time of the initial investment through December 21, 2005, Tangshan Ganglu transferred a total of $10,907,700.90 to Mapuche.

21.     Unknown to Mr. Du or Tangshan Ganglu, Chen reimbursed from the Tangshan Ganglu monies the $3 million in deposits initially made on the purchases of the Plantation Fashion Mall and the Lord & Taylor space.  Thereafter, Chen and his controlled entities had no equity in the 321 North Project or any of the entities connected with it.

**THE DEFENDANTS' MULTIPLE AND CONFLICTING LEGAL REPRESENTATION**

22.     Beginning in 2005, if not earlier, B&P began representing Chen, Mapuche, Holdings, Capital/Fashion, JZS (US), and JZS (LT). with respect to corporate transactions, real estate acquisition and development, litigation, governmental relations, land use, development of the 321 North Project, and other matters.

23.     Initially, immigration attorney Philip Guo was the primary contact between Chen,

his entities, and B&P.  In 2007, Guo relocated his practice to Hawaii and left the firm.

24.     After Guo left, Defendant Anselmo became the lead B&P lawyer for Chen and his entities.  Anselmo held herself out as having expertise in the area of corporate and real estate transactions.

25.     After Mr. Du and Tangshan Ganglu became involved with the 321 North Project, B&P and Anselmo also represented their interests in protecting their investment into the Project.

26.     While representing Mapuche, Holdings, Capital/Fashion, JZS (US), JZS LT, Mr. Du, and Tangshan Ganglu, B&P and Anselmo concurrently represented Chen, his wife, and other entities controlled by or affiliated with Chen, including Tehuelche, LLC, Centergates International, Inc., 321 North Construction Management, LLC, 321 North, LLC, 321 North Office Tower I, LLC, WCH Synergy Investments I, LLC, WCH Synergy Investments, LLC, WCH Hospitality, LLC, Super Glory Consulting, LLC, US Silver Seas Holdings, LLC, US Prosperity Holdings, LLC, US Prosperity Regional Center, LLC and WCH Synergy Investments II, LLC.

**TO PROTECT THEIR SUBSTANTIAL INVESTMENT, MR. DU AND TANGSHAN GANGLU OBTAIN CONTROL OVER THEIR SUBSTANTIAL INVESTMENT IN THE 321 NORTH PROJECT**

27.     On or before September 15, 2005, B&P drafted an Operating Agreement among Mr. Du, Chen and a third person, Shengman Zhang, which reflected the following ownership interests in Mapuche: 51% owned by Mr. Du, 30% owned by Chen, and 19% owned by Shengman Zhang.  All three were named managers.  (Exhibit "A").   When drafting the Operating Agreement, B&P represented the parties to the Agreement, including Mr. Du.

28.     Mr. Du was given a majority interest in Mapuche to reflect the fact that his company Tangshan Ganglu was the only contributor of funds to Mapuche.  Provision of the majority membership interest and a co-management position to Mr. Du was designed to protect

Plaintiff's already substantial investment into Mapuche and the 321 North Project.  B&P knew this when drafting the Operating Agreement.

29.     In October of 2005, the Plantation Fashion Mall was damaged by Hurricane Wilma.  Chen claimed that the hurricane severely harmed the operations of the Malland and caused the loss of its anchor tenant.  Therefore, Chen claimed that additional funds were needed for the Mall's operations and debt service.  Chen turned to Mr. Du and Tangshan Ganglu for that funding.

30.     Throughout 2006, Tangshan Ganglu wired additional funds totaling $5,373,940 to Mapuche for the development of the 321 North Project.

31.      As of June, 2006, JZS (US) (the entity owned and/or controlled by Chen under the name Yejun He), claimed to be the owner of 85% of the membership interests in Holdings, and Tower Capital Group, LLC owned the remaining 15%.  Mapuche, Mr. Du and Tangshan Ganglu had no ownership interest in Holdings, nor were there any loan agreements or other documents reflecting the how the monies that Plaintiffs transferred to Mapuche were to be treated.  Thus, Plaintiff's investment of millions of dollars for the ultimate use of the 321 North Project was essentially unprotected.

32.     Recognizing this,  Mr. Du decided that protection of the investment required him and Ganglu to take control of Mapuche and the 321 North Project

33.     B&P knew of the substantial investments of Tangshan Ganglu , and knew of Mr. Du's objective to protect those investments by taking majority control of the 321 North Project. To effectuate that objective, in 2006 B&P conceived of and prepared documentation transferring majority control of the 321 Project to Mr. Du and Tangshan Ganglu.

34.     The transfer of control consisted of two components.  First, B&P lawyer Robert J.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

Burnett prepared a Membership Interest Purchase Agreement, pursuant to which JZS (US), which at that point allegedly owned an 85% interest in Holdings and which was the entity owned and/or controlled by Chen under the name Yejun He, conveyed to Chen 51% of the membership interests in Holdings. (Exhibit "B").  The purchase price was left blank.

35.     Then, Burnett prepared a Membership Interest Purchase Agreement wherein Chen conveyed that 51% interest in Holdings to Mapuche--again, with the purchase price left blank. Thereafter, Mapuche would own 51% of Holdings, and the remaining 49% would be owned as follows: 34% by JZS (US) (the entity owned and/or controlled by Chen under the name Yejun He) and 15% by Tower Capital Group.  With this ownership structure, Tangshan Ganglu and Mr. Du would control 51% of the 321 North Project.

36.     At the time of the conveyance from JZS (US) to Chen and then from Chen to Mapuche, Mr. Du was not aware that Chen and Yejun He were one and the same person. Likewise, Mr. Du did not know that JZS (US) was actually controlled by Chen, nor did he know that JZS (US) had reimbursed itself for the deposits made to purchase the Plantation Fashion Mall, and therefore had no remaining equity in the project.

37.      B&P did not inform Mr. Du that Yejun He was actually Chen, and that Mr. Du was actually paying Chen—even though Chen had no equity in the project.

38.     At some point well after 2006, Mr. Du was provided with a fully executed copy of the documents evidencing the conveyance from JZS (US) to Chen and then from Chen to Mapuche.  Interestingly, the corporate records maintained by B&P reflect that the Membership Interest Purchase Agreement between Chen and Mapuche—also with a blank purchase price-- was generated years later, on May 7, 2014, and was located in the files of B&P.  (Exhibit "C"). A signature page dated June 23, 2006—containing the sole signature of JZS (US)—is attached to

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

the 2014 document.

39.     To further document the control of Mapuche desired by Mr. Du and Tangshan Ganglu to protect their substantial investment, Burnett, for B&P, drafted a Second Amended and Restated Limited Liability Company Agreement of Mapuche, LLC dated August 21, 2006 ("The Second Operating Agreement") between Tangshan Ganglu, Mr. Du, Chen, and another person. (Exhibit "D").  The Agreement set forth "the "rights and obligations of the Members with respect to the Company and its obligations." (Exhibit "D"; Recitals).

40.     When drafting the Second Operating Agreement, B&P represented all parties to that Agreement, including Mr. Du and Tangshan Ganglu.

41.     In the Second Operating Agreement, Tangshan Ganglu was for the first time reflected as the sole member of Mapuche, and Mr. Du, Chen and a third person were appointed its Managers.  The Second Operating Agreement vested day to day management in its managers, and gave Chen authority to take actions necessary and desirable for operation and management of the Company, but required that major decisions be approved by Tanshan Ganglu and Mr. Du. (Exhibit "D" at ¶5.1, 5.2).

42.     As a result of the foregoing corporate transactions, Tangshan Ganglu became the sole owner of Mapuche, which in turn owned 51% of Holdings.   Holdings owned Capital/Fashion, which in turn controlled JZS (LT).   Together, Capital/Fashion and JZS (LT) owned the Plantation Fashion Mall Property and the Lord & Taylor space.  With this corporate structure, which was designed and documented by B&P, Mr. Du and Ganglu met their objective to protect the substantial investment, by controlling a majority interest in the 321 North Project.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

### MR. DU AND TANGSHAN GANGLU BECOME THE SOLE INVESTORS/PRIMARY LENDERS ON THE 321 NORTH PROJECT

43.     On February 2, 2007, Holdings and Capital/Fashion defaulted on the secured loans that had been taken in 2004 and 2005 to purchase the property.  By 2007, those loans had been acquired by Canpartners Realty Holding Co. ("Canpartners").  Chen informed Mr. Du that he could not continue operation of the Plantation Fashion Mall and could not pay off the loans that were secured by the Mall Properties.  He asked Mr. Du to become the sole investor on the project, fund the development of the 321 North Project, and retire the existing loans on the property, which at that time exceeded $50 million.

44.     In order to protect the already substantial financial investment in the 321 North Project, Mr. Du agreed to fund the required monies through Tangshan Ganglu, but only if he and Tangshan Ganglu were given total ownership and control of Mapuche, Holdings, Capital/Fashion, and the 321 North Project.  Chen agreed.

45.     To effectuate Mr. Du's requirement of total ownership and control of the respective entities, he sought and received advice from Anselmo and B&P.  Along with Chen and others, Mr. Du met with Anselmo and B&P attorney Ryan Pinder, the managing partner of B&P's Bahamas office.  Pinder represented himself to be an expert in the area of cross-border corporate transactions.

46.     At the meeting, B&P and Anselmo advised Mr. Du that if Mapuche was going to become the 100% owner of Holdings and the 321 North Project, US law required that one of Mapuche's members be an American citizen.  Since Chen was a naturalized US citizen, Anselmo advised Mr. Du that this requirement could be satisfied by giving Chen a 1% membership interest in Mapuche as "compensation" for managing Mapuche.

47.     Mr. Du and Tangshan Ganglu followed Anselmo's advice and agreed to give

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

Chen a 1% interest in Mapuche.

48.     As of March 7, 2007, Holdings was owned 51% by Mapuche, 34% by Jin Zhi Star (US), and 15% by Tower Capital Group, LLC.  To effectuate full ownership of Holdings, Mapuche needed to acquire the remaining 49% from the other owners.

49.     Defendants structured and drafted a Membership Purchase and Option Agreement, and associated assignments of membership interests, which together sold the membership interests of JZS (US) (the entity owned and/or controlled by Chen under the name Yejun He) and Tower Capital Group to Mapuche.  The purchase price was $2.5 million.

50.     Chen signed the March 7, 2007 Membership Purchase and Option Agreement on behalf of Mapuche, using the name Wei Chen.  (Exhibit "E")  In the same document, however, Chen's position as president of JZS (US) was listed under the name Yejun He. (*Id.* p. 3). Likewise, in a corporate resolution authorizing JZS (US) to enter into the Membership Purchase and Option Agreement, Chen signed as Director, under the name Yejun He.  (Exhibit "F").

51.     Defendants did not inform Mr. Du or Tangshan Ganglu that Yejun He and Wei Chen was the same person, or that JZS (US) was in reality controlled by Chen. Consequently, Mr. Du did not know that he was actually paying Chen to purchase the remaining interests of JZS (US) in Holdings.

52.     As a result of this transaction, Tangshan Ganglu wholly owned Mapuche, which wholly owned Holdings, which wholly owned Capital/Fashion, which wholly owned JZS (LT). Through this structure, Mr. Du and Tangshan Ganglu wholly owned and had ultimate control of the Plantation Fashion Mall and the former Lord & Taylor site.  Mr. Du remained a manager of Mapuche, and all major decisions were to be made by Tangshan Ganglu as sole member. (Exhibit "D" at ¶5.2).

53.     On March 16, 2007, Anselmo provided a memorandum to Mr. Du (with a copy to Chen) enclosing and explaining the March 7, 2007 acquisition documents.  In the memorandum, Anselmo described the resulting ownership structure making Tangshan Ganglu the ultimate owner of the 321 North Project, and advised Mr. Du and Tangshan Ganglu about certain buy-back rights granted to JZS (US).  (Exhibit "G"). In the memorandum, Anselmo did not disclose that JZS (US) was owned and controlled by Chen.

54.     On April 16, 2007, in accordance with Anselmo's legal advice that US law required that an American citizen be a member of Mapuche, Tangshan Ganglu assigned to Chen 1% of its membership interest in Mapuche.  (Composite Exhibit "H").  B&P drafted the assignment documents.

55.     After taking full ownership and control of the 321 North Project, Tangshan Ganglu provided substantial additional funds to rescue the project and retire the substantial indebtedness encumbering the properties.

56.     From March, 2007 through May 29, 2007, Tangshan Ganglu wired $6,512,035 to Mapuche for this purpose. Nevertheless, Canpartners filed a foreclosure action on July 9, 2007.

57.     Within days of the foreclosure action being filed, the parties settled the action. The settlement required the Canpartners loans to be paid down to $40 million by the end of October, 2007.  For this purpose, from March 13, 2007 through October 23, 2007, Tangshan Ganglu, or its affiliates on its behalf, wired an additional $36,714,933 to Mapuche.

58.     In early 2008, Tangshan Ganglu, or its affiliates on its behalf, provided Mapuche with an additional $42,400,000, for the purpose of fully satisfying the Canpartner loans and funding further development of the 321 North Project.

59.     After the Canpartner loans were retired, Mr. Du and Chen asked Anselmo to

inform them of the current ownership of the various pieces of the Plantation Fashion Mall, and asked whether the properties should be retitled in the name of Mr. Du or Tangshan Ganglu.  On March 21, 2008, Anselmo advised them in writing that the office tower and retail portions of the Mall—other than the Lord and Taylor site and the Sheraton Hotel—were owned by Capital/Fashion and that the Lord & Taylor site was titled in the name of JZS (LT).  (Exhibit "I").

60.     In the March 21, 2008 letter, Anselmo also provided legal advice to Mr. Du, Tangshan Ganglu and Chen about whether to place title to the properties in any individual's name, stating: "Ownership of this commercial property should always be held by an entity to shield personal assets from liability; which means, it is not prudent to ever hold title to commercial property in your individual name.  The current structure of ownership adequately protects the individual members from any personal liability association (sic) with the construction, operation or management of this property.  If you do wish to have this property conveyed and titled in an individual name, we can complete that paperwork, however, simultaneously with delivery of that deed **we will require the individual taking title to execute an acknowledgement and waiver confirming that they are acting against the advise (sic) of counsel** and that they recognize and acknowledge that immediately upon taking title, they will be personally liable for any claims and their personal assets may be at risk.  Again, I strongly recommend against any individual holding title to this property in their individual name.  That being said, any entity that is controlled by a single individual, remains a safe and better alternative for vesting title."  (emphasis added).  Anselmo further advised that outstanding expenses and liabilities encumbering the property must be satisfied prior to transferring title.

61.     Mr. Du and Ganglu followed their counsel's advice, and did not transfer title to

the properties.

62.     In July of 2008, Mr. Du asked a New York based lawyer, Harold Nathan, to advise and assist him with determining whether the appropriate owner of Mapuche should be Tangshan Ganglu or Mr. Du.  Nathan advised and assisted with various transactions regarding the ownership of the Mapuche membership interests.

63.     As part of this project, Nathan wrote to Anselmo asking who controlled JZS (US) and about whether any Jin Zhi Star entity ever owned 85% of Holdings.  (Exhibit "J").  Anselmo failed to disclose that Chen controlled JZS (US) and JZS (LT) under the name Yejun He. Moreover, Anselmo inaccurately represented that JZS (US) had "never" owned 85% of Holdings.  When asked when Mapuche's 51% interest in Holdings was acquired, Anselmo inaccurately stated "original issue", thereby suggesting that the 2006 transactions described above, which were created and documented by B&P, never even occurred.

64.     After the Canpartner loans were retired, Tangshan Ganglu, directly and through affiliates, wired an additional $13,100,000 to support the operations and development of the 321 North Project.

**THE SECRET THIRD AMENDED OPERATING AGREEMENT AND THE FORGED CONSENT TO IT**

65.     By 2010, Tangshan Ganglu had advanced over $100 million to Mapuche for the purpose of redeveloping the Plantation Fashion Mall.  Mr. Du had made it very clear to Chen and to B&P that the paramount condition to the investment was that he and Tangshan Ganglu own and have the ability to control the 321 North Project.  B&P had advised Mr. Du and Tangshan Ganglu as to how to accomplish that, had documented it for them, and had advised them regarding potential liabilities associated with ownership of a commercial real estate project.

66.     Also as part of their efforts to protect Plaintiff's substantial investment, B&P  had

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

drafted the Second Operating Agreement for Mapuche, which provided Tangshan Ganglu and Mr. Du with the ability to control the management of Mapuche

67.     Inexplicably, however, in or around April of 2010 B&P and Anselmo drafted corporate documents which completely destroyed Plaintiff's control over the 321 North Project. In particular, B&P and Anselmo created a new operating agreement for Mapuche, which removed essentially all the protections and control over management of the Project provided for in the Second Operating Agreement. They did so without discussing the change with Mr. Du or Tangshan Ganglu, without showing the proposed amended operating agreement to them, and without even providing a signature line for Tangshan Ganglu—the 99% member—or Mr. Du— the co-manager.

68.     Allegedly in April 2010, Anselmo and B&P drafted two documents, which effectively transferred unbridled control and effective ownership of Mapuche to Chen. First, they drafted a Third Amended Operating Agreement ("Third Operating Agreement"; Exhibit "K"). Although the Third Operating Agreement stated that it is "entered into by the members," it was signed solely by Chen as "manager."

69.     The Third Operating Agreement falsely stated that (i) Chen owns 20% of Mapuche's membership interests, and (ii) "The Members desires (sic) to enter into this Agreement in order to amend and restate the Second Amended and Restated Operating Agreement." In reality, however, when drafting this statement and arranging for it to be signed solely by Chen as manager, B&P had not even informed Tangshan Ganglu and Mr. Du of what it was doing, much less obtain their informed consent.

70.     The Third Operating Agreement transferred to Chen unfettered power to control Mapuche, the 321 North Project, the assets and the cash, and effectively blocked Tangshan

Ganglu from removing that power from him.  It left Tangshan Ganglu-- the 99% owner—and Mr. Du without any authority or power over Chen, or any control or even access to the monies they were advancing for the 321 North Project assets .

71.     The Third Operating Agreement made substantial changes to the relationship of the parties as set forth in the Second Operating Agreement.  Among other material changes, the Third Operating Agreement: (i) made Chen the sole manager, with the right to unilaterally borrow money, obtain new investors, encumber the assets,  enter into joint venture agreements and engage in any business that he desires (¶5.1); (ii) required all funds to be deposited in a bank account for which Chen is the sole signatory (¶5.1.4); (iii) vested Chen with the sole power to make "all decisions, consents, approvals, votes or other rights to take action on behalf of" Mapuche other than a few actions that require unanimous approval of the Members and Chen as manager, which effectively gave the 1% owner veto power over anything that the 99% owner wanted to do (¶5.1.6; 5.2); (iv) provided that "so long as Wei Chen is a Member, Wei Chen must remain as a Manager of the Company, and no other manager or managers may be appointed unless [approved unanimously by the members]" which—due to B&P's advice to grant Chen a 1% membership interest—included Chen (¶5.1); (v) permitted Chen to compete with Mapuche without violating his fiduciary duties (¶5.7); (vi) authorized Chen to set his own compensation (¶5.4); (vii) gave Chen the ability to limit Tangshan Ganglu's and Mr. Du's compensation and reimbursement of expenses (¶ 5.4); and  (viii) provided that members waive any right to cause the termination or dissolution of the Company by court decree (¶4.3.5).

72.     The Third Operating Agreement also provided that it cannot be amended without the approval of Chen. (¶9.2).

73.     Moreover, in the event of any action to enforce the Third Operating Agreement,

Tangshan Ganglu waived its right to a jury trial. (¶9.18).

74.     All of the foregoing provisions were materially different than the Second Operating Agreement, and were inconsistent with Mr. Du and Tangshan Ganglu's expressed condition to becoming the sole investor in the 321 North Project.  Defendants were aware of that condition when drafting the Third Operating Agreement, yet did not inform Mr. Du and Tangshan Ganglu, obtain their assent, or even speak to them before deleting all of the protections that they had included in the Second Operating Agreement.

75.     Clearly, drafting and providing for execution of a Third Operating Agreement that fundamentally alters the relationship between their clients—to the benefit of client Chen and to the detriment of clients Mr. Du and Tangshan Ganglu--placed B&P and Anselmo in a position of irreconcilable conflict.  The Firm obviously recognized that conflict, because it attempted to immunize itself for any liability for having chosen to represent Chen's interests adversely to Mr. Du and Tangshan Ganglu.

76.     First, the Third Operating Agreement contained language that purported to disclose B&P's conflict; it stated that the parties acknowledge that they "HAVE BEEN ADVISED BY THE LAW FIRM THAT A CONFLICT EXISTS AMONG THEIR INDIVIDUAL INTERESTS; AND …HAVE BEEN ADVISED BY THE LAW FIRM TO SEEK THE ADVICE OF INDEPENDENT COUNSEL; AND THE PARTIES HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT COUNSEL." (¶9.20(a), (b)(c); capitalization in original).

77.     This statement is false. In reality, neither B&P nor Anselmo ever discussed the Agreement with Mr. Du or Tangshan Ganglu, and never advised either of their conflict, the potential problems that would arise from such a conflict, or the necessity to seek the advice of

independent counsel.  Thus, Plaintiffs had no opportunity to consult with counsel about an issue of which they were never informed.

78.     The Defendants also never obtained an informed waiver of the conflict.  In the document itself, B&P and Anselmo included a purported retrospective and prospective waiver and release of the conflict.  The Third Operating Agreement stated: "all parties hereto acknowledge and agree that BP has in the past represented, and shall continue in the future to represent, the individual interests of Wei Chen, and/or any Affiliates.  Furthermore, all parties hereto, by way of their respective signatures herein below (sic), waive any and all conflicts, and any and all rights which any of said parties may otherwise have to claim that any conflict exists, as a result of, with respect to or in connection with BP's past and/or future representation of Wei Chen, and/or any Affiliates, regardless of whether such representation relates to or shall relate to, in any manner whatsoever, the subject matter of this Agreement and/or the Company or the Company's Business.  The provisions of this paragraph shall survive the termination of this Agreement and any Member's status as a Member of the Company."  (¶ 9.20)

79.     Although the Third Operating Agreement stated that a member's signature constituted a waiver of their conflict, B&P did not include a signature line for Tangshan Ganglu or Mr. Du.  It was signed only by Chen.

80.     This is unlike any other operating agreement drafted for Mapuche, Holdings or Capital/Fashion up to that time.  Indeed, B&P had prepared several operating agreements and resolutions for Mapuche, Holdings and Capital/Fashion; none of the other agreements disclosed any conflict of interest or contained a waiver of the conflict.  Moreover, the only Operating Agreement that failed to provide a signature line for the members was the Third Operating Agreement.  In fact, in the summer of 2010 B&P also drafted new operating agreements for

Holdings and Capital/Fashion. Each of them provided for a signature by the member. (Composite Exhibit "L, M").

81. Instead of providing that the 99% owner and the co-manager signify their agreement by signing sign the Third Operating Agreement, B&P and Anselmo drafted a "Joint Unanimous Written Consent of Members and Managers" ("Mapuche Consent") which purportedly authorized Chen to unilaterally sign the Third Operating Agreement on behalf of Tanshan Ganglu and Mr. Du. (Exhibit "N"). The Consent did not disclose the Defendants' conflict, nor did it describe the retroactive and prospective waiver of B&P's conflict purportedly granted in the Third Operating Agreement. It also did not disclose that the Third Operating Agreement effectively prohibits Plaintiffs from removing Chen as manager, amending the Agreement without Chen's permission, or seeking a judicial dissolution of Mapuche. Most importantly, the Consent did not disclose that Tangshan Ganglu and Mr. Du were losing all rights to protect or obtain the assets that their money had created.

82. However, the Consent did purport to disclose to Mr. Du and Tangshan Ganglu—for the first time—that Wei Chen and Yejun He are one and the same person.

83. B&P and Anselmo did not speak with Mr. Du and Tangshan Ganglu about the Mapuche Consent or the Third Operating Agreement. They did not obtain Tangshan Ganglu or Mr. Du's signature on the Consent. They did not send either document to them. Instead, they left it to Chen, the client who was the recipient of all the benefits of the Third Operating Agreement-- to obtain Mr. Du's signature.

84. Mr. Du did not sign the Consent. His signature was forged. (Exhibit "O").

85. When the Consent was returned to B&P with what purported to be Mr. Du's signature, Defendants did not confirm with Mr. Du that he had indeed signed it. They never

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

provided him with an executed copy of either the Consent or the Third Operating Agreement. They never spoke to Mr. Du about it.

86.     Also in April of 2010, B&P drafted another Joint Unanimous Written Consent of Members and Managers ("the Capital/Fashion Consent"), which authorized a new Operating Agreement for Capital/Fashion.   (Exhibit "P").   Like the new governing agreements for Mapuche, this new Operating Agreement for Capital/Fashion ("The 2010 Capital/Fashion Operating Agreement") appointed Chen as sole manager, and removed Plaintiffs' right to replace Chen, or to appoint any other managers, without his consent.  (Exhibit M).  Like Mapuche's Third Operating Agreement, it also dramatically expanded Chen's authority by providing him with unilateral and unfettered power to (i) borrow money and encumber the assets of the Project, (ii) have sole authority over the Project's receipts, disbursements and bank accounts, and (iii) enter into joint ventures or partnerships with others.   Also like the Mapuche Third Operating Agreement, the Capital/Fashion Consent disclosed for the first time that Wei Chen and Yejun He is the same person.

87.     B&P and Anselmo did not speak with Mr. Du about the 2010 Capital/Fashion Operating Agreement or the Capital/Fashion Consent. They did not explain that the Agreement gave Chen extensive authority over the assets of the 321 North Project—including the right to unilaterally borrow money secured by its assets—or that they were losing the ability to remove Chen or add any other managers without his consent.

88.     Defendants also failed to obtain Mr. Du's signature on the Capital/Fashion Consent authorizing Chen to amend the Capital/Fashion Operating Agreement.  They did not send either document to him.  Instead, they left the task to Chen, the client who was the recipient of all the benefits of the expanded authority over the Project.

89.     Mr. Du did not sign the Capital/Fashion Consent.  The signatures attached to the Consent were taken from a different resolution—purportedly signed by Mr. Du—that had nothing to do with the Capital/Fashion Consent or the amended Operating Agreement purportedly authorized by it.   (Exhibit "Q").

90.     Mr. Du and Tangshan Ganglu did not receive or review the Mapuche Consent, the Mapuche Third Operating Agreement, the Capital/Fashion Third Operating Agreement, or the Capital/Fashion Consent, until May of 2014 when they were produced in connection with litigation with Chen.  Thus, Plaintiff did not know—nor could it reasonably have known—of the Defendants' malpractice.

### THE 2012 BANKRUPTCY PROCEEDINGS AND TANGSHAN GANGLU'S ADDITIONAL $48,650,000 LOAN

91.     In July of 2010, Chen used the authority granted to him by the Mapuche and Capital/Fashion Amended Operating Agreements to unilaterally borrow an additional $15 million from Canpartners.  (Exhibit "R").  The loan was secured by a mortgage on the 321 North Project assets.  Importantly, the loan was personally guaranteed by Chen.

92.     Chen and Defendants did not inform Mr. Du or Tangshan Ganglu of the loan.

93.     B&P represented Chen in connection with the loan guaranty.

94.     In 2007, the City of Plantation had revoked the Operating Certificate for the Plantation Fashion Mall.  After unsuccessfully attempting to undo that revocation, Holdings and Capital/Fashion attempted to negotiate lease termination agreements with the Mall's tenants.  Two restaurant tenants did not agree, and filed lawsuits for breach of lease.  By 2012 the restaurant tenants had not been satisfied.  One had obtained a judgment lien, which triggered a default of the $15 million loan.  As a result, Canpartners brought a foreclosure on the properties and also filed a claim for breach of guaranty against Chen.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

95. Mr. Du and Tangshan Ganglu were not informed about the Canpartners foreclosure action or its suit against Chen. Instead, Chen informed Mr. Du that judgments obtained by the restaurants necessitated the filing of bankruptcy. On February 24, 2012, Chen put Holdings and Capital/Fashion into bankruptcy and sought reorganization under Chapter 11 of the Bankruptcy Code.

96. Again faced with the potential loss of their substantial investment, Tangshan Ganglu and Mr. Du agreed to lend substantial funds through Mapuche to fund the bankruptcy reorganization plan. At the time that they agreed to do so, Tangshan Ganglu and Mr. Du were unaware of the April 2010 revisions to the governing agreements, or their effect upon their ability to control Chen, the 321 North Project, or the use of their money.

97. To facilitate their agreement to fund the reorganization plan and further development, Tangshan Ganglu signed three commitment letters for loans to Mapuche in the amounts of $10 million, $15 million, and $25 million respectively, for a total of $50 million. (Exhibit "S"). Each commitment letter stated that a mortgage on the Plantation Fashion Mall property would be provided to secure the loan.

98. From the period of March 27, 2012 through August 2, 2012 Tangshan Ganglu fulfilled the loan commitments. Directly, through affiliated companies, and through Mr. Du, Tangshan Gaglu lent $48,650,000 to Mapuche.

99. These funds were used to fund all obligations to creditors and professionals associated with the bankruptcy proceedings. Holdings and Capital/Fashion therefore successfully emerged from bankruptcy. .

100. When making these loans, the Plaintiff did not know that Chen or his designee had forged Mr. Du's signature on documents that essentially deprived both Mr. Du and Tangshan

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

Ganglu of all rights to control or protect the assets that purportedly were securing the loans.  It had no idea that it was lending $48,650,000 to an entity over which it no longer had any real control, and which was being operated by a person who had forged Mr. Du's signature on key documents.

101.    Plaintiff would not have made the loans had it known that the Second Operating Agreement had been replaced with a forged document depriving it of its rights, created by its lawyers without its knowledge.

### CHEN'S SUBSEQUENT BREACHES OF FIDUCIARY DUTY

102.    Beginning in 2014, Mr. Du and Tangshan Ganglu learned that Chen had usurped business opportunities belonging to Mapuche, Holdings and Capital/Fashion, using Mapuche's funds to do so.  They also learned that Chen had engaged in other defalcations of Mapuche's funds.  Defendants represented Chen and his affiliated entities in connection with some or all of these transactions.

103.    Defendants never informed Plaintiff of Chen's attempt to usurp the corporate opportunities belonging to Mapuche, Holdings and Fashion/Capital, or of their representation of Chen and his entities.  They also did not explain to Mr. Du or Tangshan Ganglu the import of Chen's actions on the substantial investment into the 321North Project.  They never sought or obtained an informed waiver of their conflict in representing Chen and his entities in these transactions.

### B&P'S ATTEMPTS TO PREVENT PLAINTIFFS FROM PROTECTING THEIR RIGHTS AFTER CHEN'S MISUSE OF THE LOANED FUNDS IS REVEALED

104.    By April of 2014, no payments had been made on the $48,650,000 loan from Tangshan Ganglu. For this reason, Mr. Du travelled to Florida to inspect the Mall Properties and see the progress of construction of the 321 North Project, and to collect repayment of the loan.

105.    Mr. Du met with Chen, who informed him that $12 million remained in Mapuche's bank account.   Mr. Du asked to see the accounting records and to meet with Mapuche's accountant.   After being put off for a few days, Mr. Du finally met with the accountant, who informed him that only $1,200,000 remained in the account.

106.    Construction on the project was at a standstill, even though Holdings had taken out a construction loan in 2013, for close to $20 million.

107.    Mr. Du requested a formal meeting with all of Mapuche's employees, but was informed that they had all been told to work from home.  On May 4, 2014, Mr. Du's son went to Mapuche's offices as Mr. Du's representative, and was met by security guards, a Mapuche employee, and Anselmo, who informed him that he could not call a corporate meeting and could not even enter the building.

108.    In an attempt to gain control of the assets that had been accumulated and supported by $161 million invested and loaned, Tangshan Ganglu filed litigation to judicially dissolve Mapuche and for other relief.  It alleged that Chen had abandoned his managerial duties and had sought to serve and benefit only himself.    It also alleged that Chen had falsified and destroyed Mapuche records.

109.    The litigation sought a judicial decree dissolving Mapuche, and appointment of a custodian to protect the 321 North Project's assets.  As 99% owner, the dissolution of Mapuche would have enabled Tangshan Ganglu and Mr. Du to take control of the assets comprising the 321 North Project, complete construction with professional, honest, and experienced managers, and recoup some or all of their substantial investment.

110.    Because it was the subject of the judicial dissolution, Mapuche was joined as a nominal defendant.  B&P appeared on Mapuche's behalf, and aggressively opposed Plaintiff's

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

attempts to gain control of the assets created by its investments and loans.  Clearly, B&P took direction from Chen to advocate against their other clients.

111.    Ostensibly representing Mapuche—the neutral party—B&P denied that Chen had usurped corporate opportunities, misused Mapuche's funds for his own benefit, and had kept inadequate records or destroyed them.  (Exhibit "T").

112.    B&P also argued that the Plaintiff's attempt to judicially dissolve Mapuche was sanctionable, because the Third Operating Agreement contained a waiver of Tangshan Ganglu's right to seek a judicial dissolution of Mapuche.  (Exhibit U)

113.    Purportedly representing the neutral party, but clearly representing the interests of their other client Chen, B&P denied that the Consent allowing Chen to sign the Third Operating Agreement was a forgery.

114.    Also purportedly representing Mapuche—and not Chen—on June 6, 2014 B&P actually sued Mr. Du and Tangshan Ganglu in a separate state court action for fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, violations of Florida's Deceptive and Unfair Trade Practices Act, breach of contract and declaratory relief.  (Exhibit "V").  The lawsuit—verified by Chen and obviously filed at his direction as part of the strategy to keep him in control of Mapuche and the 321 North Project—was based upon the dubious theory that Mr. Du and Tangshan Ganglu had defrauded Mapuche by entering into a loan agreement for the $48,650,000  that Mapuche eventually received from Tangshan Ganglu.  While the verified complaint admitted that the money had been received, it contended that Mr. Du had no authority to enter into a loan agreement on behalf of Mapuche.  The primary basis for the Verified Complaint was that the Third Operating Agreement gave all authority to Chen, and none to Mr. Du.  (*Id.* at ¶¶ 26-27).  In other words, B&P again attempted to enforce the secret Third

Operating Agreement that they had prepared, and that had been approved with a forged signature. For Chen's benefit, Defendants sued to deprive Plaintiff of the very rights provided for in corporate documents that they had prepared to protect the interests of Tangshan Ganglu and Mr. Du.

115.   The Court presiding over the judicial dissolution action appointed an Examiner to report back to the Court. In his report, the Examiner raised numerous serious issues. He found evidence that Chen had potentially committed securities fraud and other violations of law, fraud, conversion, breach of fiduciary duty, gross mismanagement, usurpation of corporate opportunity, and theft of corporate assets. (Exhibit "W"). B&P—purportedly on behalf of the neutral party Mapuche—objected to the Examiner's report and findings. (Exhibit "X").

116.   After holding an evidentiary hearing with testimony from Anselmo, Chen, Mr. Du, and handwriting experts, the Court found that "whether it is the civil burden, the criminal burden or the punitive damages burden; whether it is by the preponderance of the evidence, clear and convincing evidence or the standard urged by Mr. Chen with respect to a temporary injunction, the Court believes Mr. Du's testimony that he did not execute the Joint Unanimous Written Consent." (Exhibit "O").

117.   Thus, Defendants not only created documents that favored one client's interests at the expense of other clients—and failed to inform those clients of what they were doing—they unsuccessfully attempted to enforce those documents against their clients.

118.   After the Court's oral ruling finding Mr. Du's signature on the Consent to have been forged—but before the Court had entered a written order—counsel for Plaintiff sent e-mails and letters to Defendant Anselmo (who had left B&P and joined Hinshaw & Culbertson) requesting a corporate meeting to discuss the dissolution of Mapuche. Anselmo did not respond

and also did not inform counsel for Plaintiff that Chen was considering placing Mapuche, Holdings, and Capital/Fashion into bankruptcy proceedings.

119.   After joining her new firm, Anselmo met with Chen and others to plan for the bankruptcy filing.  She did not inform Plaintiff that Chen was considering placing the companies into bankruptcy.

120.   Before the judicial dissolution Court could enter a written ruling that the Third Operating Agreement was forged, and without informing or obtaining the consent of Tangshan Ganglu or Mr. Du, Chen caused Mapuche, Holdings and Capital/Fashion to file for liquidation under Chapter 7 of the Bankruptcy Code.  This triggered a default in a construction loan that had been taken out by Holdings and Capital/Fashion.  Chen used the Third Operating Agreement as authority for him to unilaterally file the corporate bankruptcies.

121.   A trustee was appointed to administer the bankruptcy liquidation, who in turn hired lawyers, accountants, and other professionals, resulting in continuing administrative expenses that exceed $2 million.  The Plantation Fashion Mall was eventually sold at an auction, for a small fraction of what Plaintiff had invested into the project.  Plaintiff's potential recovery in the bankruptcy proceedings will be insufficient to satisfy the loans for $48,650,000, and will not provide any compensation to Plaintiffs for the loss of more than $112 million in equity that they contributed to Mapuche over the years.

**COUNT I**
**(LEGAL MALPRACTICE)**
**(All Defendants)**

122.   Plaintiff realleges paragraphs 1 through 121 herein.

123.   From at least September, 2005, B&P and Anselmo had an attorney-client and principal-agent relationship with Mapuche, Holdings, Fashion Mall, Chen, Chen's wife and

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

affiliates, Mr. Du, and Tangshan Ganglu.

124.    Plaintiff (i) reasonably believed that it was consulting Defendants for professional legal advice regarding protection of its interest relating to its investment into and participation in the development of the 321 North  Project, and (ii) manifested to Defendants its intent to obtain legal services from them.

125.    Defendants knew or should have known that their actions would induce Plaintiff to reasonably believe that it had formed attorney-client relationships with B&P and Anselmo with respect to protection of their interests in the 321 North Project, and in the commercial relationship among Mr. Du, Tangshan Ganglu, and Chen.  In particular, Defendants:

(a) Drafted the original and Second Operating Agreements among Tangshan Ganglu, Mr. Du and Chen, which set forth their rights and obligations with respect to Mapuche and contained protections for Tangshan Ganglu and Mr. Du;

(b) Advised Mr. Du and Tangshan Ganglu in connection with their objective in 2006 to protect their investment, and conceived of and drafted documents evidencing transactions that made Tangshan Ganglu the sole member of Mapuche, and which made Mapuche the majority owner of Holdings and Capital/Fashion;

(c) Advised Mr. Du and Tangshan Ganglu in connection with their objective in 2007 to obtain full control of the 321 North Project, and attempted to fulfill that objective by conceiving a corporate structure that would give Plaintiffs ownership and control over the management of the 321 North Project;

(d) Drafted documents implementing the structure that they had created;

(e) Provided a written memorandum to Mr. Du on March 16, 2007 regarding Mapuche's acquisition of Holdings and explaining the structure that they had created;

(f) Advised Mr. Du and Tangshan Ganglu that US law required that Mapuche have an American citizen as a member, and advised Tangshan Ganglu to give Chen 1% of the company;

(g) Drafted documents effectuating the transfer of a 1% membership interest to Chen;

(h) In a letter dated March 21, 2008, advised Mr. Du, Tangshan Ganglu and Chen not to transfer properties into their individual names because of potential personal liability, and urged them to keep title in a company.  The Defendants stated that "If you do wish to have this property conveyed and titled in an individual name, we can

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22ⁿᵈ Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

complete that paperwork, however, simultaneously with delivery of that deed **we will require the individual taking title to execute an acknowledgment and waiver confirming that they are acting against the advice of counsel** and that they recognize and acknowledge that immediately upon taking title, they will be personally liable for any claim and their personal assets may be at risk." (emphasis added). The Defendants further "strongly recommend(ed) against any individual holding title to this property in their individual name."

(i) Drafted other legal documents reflecting the rights, obligations and transactions among Mr. Du, Tangshan Ganglu, and Chen; and

(j) Accepted payment from Mapuche, Holdings and/or Capital/Fashion with knowledge that the source of all such payments were funds advanced by or on behalf of Tangshan Ganglu.

126.    Defendants indicated through their provision of legal advice and services to Plaintiff, and acceptance of payment from funds advanced by Plaintiff, that they consented to provide legal services to Plaintiff.  Defendants certainly never denied directly or indirectly to Plaintiff that their advice and provision of legal services to Plaintiff did not constitute an attorney-client relationship with them.  Defendants, through their actions, are now estopped to deny the existence of the relationship.

127.    Plaintiff's reliance on the actions of Defendants was reasonably foreseeable.

128.    As attorneys for Mr. Du and Tangshan Ganglu, Defendants had duties of care, competence, loyalty and diligence.  Moreover, because Defendants claimed to possess special legal skills in the areas of corporate and real estate transactions, Defendants had a special duty to Tangshan Ganglu to act with the care, competence and diligence normally exercised by lawyers having such skill and knowledge.

129.    Defendants had the duty to bring their best efforts to bear on the acquisition and development of the Plantation Fashion Mall and related projects and the protection of Plaintiff's investment.  At a minimum, Defendants had the duty to disclose to Plaintiff their concurrent representation of Chen and related parties, and to refrain from representing those parties in a

manner adverse to Plaintiff's interests.

130.   Defendants breached their duties of care, competency, loyalty and diligence by negligently:

(a) Failing to disclose their conflict in their multiple representations of Mr. Du, Tangshan Ganglu, Holdings, Capital/Fashion, JZS, Chen, his wife, and their controlled entities;

(b) Failing to advise Plaintiff that their representation of Chen and his affiliates created a substantial risk that their representation of Plaintiff's interests would be materially limited by their representation of Chen;

(c) Failing to obtain Plaintiff's fully informed consent to the dual representation;

(d) Failing to protect Plaintiff's rights in connection with the 321 North Project;

(e) Representing the interests of Chen and his affiliates adversely to the Plaintiff's interests;

(f) Drafting the Third Operating Agreement of Mapuche, the Consent to enter into that Agreement, the Capital/Fashion Third Operating Agreement, and the Capital/Fashion Consent, which deprived Plaintiff of essentially all of its rights to control or influence the activities of Chen with respect to the multi-millions of dollars it had invested and loaned for the benefit of the 321 North Project;

(g) Failing to advise Plaintiff of the existence of the Mapuche Third Operating Agreement and the Capital/Fashion Third Operating Agreement;

(h) Failing to explain to Plaintiff the deleterious effect on Plaintiff's rights caused by the Operating Agreements;

(i) Failing to seek or obtain Plaintiff's consent to the Third Operating Agreements;

(j) Failing to ensure that Plaintiff actually executed the Third Operating Agreements, or the Consents to enter into them;

(k) Failing to deliver copies of the Third Operating Agreements to Plaintiff;

(l) Enabling Chen or his designee to forge Mr. Du's signature on the Consent to the Mapuche Third Operating Agreement;

(m) Failing to discover the forgery and inform Plaintiff of it prior to its loans in 2012 of $48.65 million;

(n) Accepting a signature page from another corporate resolution as being the signatures to the Capital/Fashion Consent;

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

(o) Failing to discover that the signature page used for the Capital/Fashion Consent was actually from another corporate resolution having nothing to do with the Capital/Fashion Third Operating Agreement;

(p) Failing to inform and advise Plaintiff that the signature page for the Capital/Fashion Consent had been taken from an unrelated resolution prior to Plaintiff's loans of $48.65 million to Mapuche to fund the bankruptcy reorganization plan;

(q) Representing and assisting Chen and his affiliates in breaching their fiduciary duties to Plaintiff,;

(r) Continuing to represent Chen after learning that he had utilized funds advanced by or on behalf of Plaintiff to Mapuche, to purchase assets in his own name or in the name of affiliates;

(s) Failing to inform Plaintiff of Chen's breaches of fiduciary duty;

(t) Failing to inform Plaintiff of Chen's use of differing names;

(u) Failing to inform Plaintiff of Chen's criminal issues in China;

(v) Opposing Plaintiff's attempts to obtain control of the 321 North Project through an action to judicially dissolve Mapuche, and by instead advocating for Chen in opposing the litigation rather than remaining neutral or declining the representation;

(w) Relying on the forged Third Operating Agreement to prevent Plaintiff from obtaining control of the assets purchased with its funds;

(x) Filing suit against their former clients based upon the forged Third Operating Agreement; and

(y) Failing to adequately supervise attorneys working on the engagement, and failing to ensure that all B&P lawyers conform to appropriate standards of professional conduct, including the duties of care, competence, loyalty and diligence.

131.    Defendants' breaches of their duties proximately caused damage to Plaintiff.

First, had Plaintiff known that B&P had drafted documents which essentially destroyed all of its rights to have any control over its investment in Mapuche, or over Chen's activities, Plaintiff would not have lent $48.65 million to Mapuche.  Likewise, had Plaintiff known that Mr. Du's signature had been forged and misused to effectuate the destruction of its rights, it would not have made the loans to Mapuche. Even after an eventual distribution from the bankruptcy proceedings, the losses from these loans exceed $30 million.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

132.     Second, the waiver of Plaintiff's rights in the Third Operating Agreement, and Defendants' active attempt to enforce the Agreement to prevent Plaintiff from judicially dissolving Mapuche and obtaining its assets, enabled Chen to put Mapuche, Holdings and Capital/Fashion into bankruptcy proceedings without Plaintiff's consent.  The bankruptcy filing triggered a default in the construction loan.  In those proceedings, the Plantation Fashion Mall assets were sold at an auction for a fraction of the $161 million invested and loaned by Plaintiff. Plaintiff lost the ability to develop the project with competent management, and thereby to recoup its investment.  Defendants' malpractice therefore proximately caused Plaintiff a loss of no less than $140 million.

Wherefore, Plaintiff demands entry of Judgment against Defendants for damages exceeding $75,000, plus pre-judgment interest, and such further relief as is just and proper.

## COUNT II
## (LEGAL MALPRACTICE)
### (Against Anselmo)

133.     Plaintiffs reallege paragraphs 1 through 121 herein.

134.     After leaving B&P, Anselmo continued to have the same professional responsibilities to Plaintiff as when she was at B&P.

135.     By participating in pre-bankruptcy planning conferences with Chen and others, Anselmo advocated against the interests of Plaintiff, her other client.

136.     By doing so, Anselmo breached the standard of care governing lawyers in the State of Florida.

137.     Anselmo's participation in the decision to place Mapuche, Holdings, and Capital/Fashion into bankruptcy proximately caused Plaintiff damage.  The filing of bankruptcy proceedings triggered a default in the construction loan.  In those proceedings, the Plantation

31

Fashion Mall assets were sold at an auction for a fraction of the $161 million invested and loaned by Plaintiff.  Plaintiff lost the ability to develop the project with competent management, and thereby to recoup its investment.  Defendants' malpractice therefore proximately caused Plaintiff a loss of no less than $140 million.

Wherefore, Plaintiff demands entry of Judgment against Defendant Anselmo for damages exceeding $75,000, plus pre-judgment interest, and such further relief as is just and proper.

## COUNT III
### (BREACH OF FIDUCIARY DUTY)
### (Against All Defendants)

138.    Plaintiffs reallege paragraphs 1 through 121 herein.

139.    Defendants had fiduciary duties to Plaintiff, including the duty of loyalty.

140.    Due to the adverse financial interests dividing Plaintiff and Chen, there existed a substantial risk that Defendants' representation of Plaintiff would be materially limited by their representation of Chen and his affiliates.

141.    By choosing to represent Chen and his related companies adversely to Plaintiff's interests, Defendants intentionally placed their own financial interests above the interests of the Plaintiff.

142.    Defendants intentionally breached their fiduciary duties to Plaintiff by:

(a) Representing Chen and his related entities adversely to Plaintiff.

(b) Assisting Chen and his related entities to breach their fiduciary duties to Plaintiff;

(c) Failing to exercise candor in their dealings with Plaintiff;

(d) Failing to communicate and explain their conflict of interest, and the material risks created by their dual representation;

(e) Failing to communicate to Plaintiff the ramifications of the Third Operating Agreements; and

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

    (f)  Failing to decline to represent Chen adversely to Plaintiff, or to withdraw from the representation when the conflict became apparent.

143.    Defendants' breaches of their fiduciary duty proximately caused damage to Plaintiff.  First, had it known that B&P had drafted documents which essentially destroyed all of its rights to have any control over their investment in Mapuche, or over Chen's activities, Plaintiff would not have lent $48.65 million to Mapuche.  Likewise, had Plaintiff known that Mr. Du's signature had been forged or misused to effectuate the destruction of its rights, it would not have made the loans to Mapuche. Even after an eventual distribution from the bankruptcy proceedings, the losses from these loans exceed $30 million.

144.    Second, the waiver of Plaintiff's rights in the Third Operating Agreement, and Defendants' active attempt to enforce the Agreement to prevent Plaintiff from judicially dissolving Mapuche and obtaining its assets, enabled Chen to put Mapuche, Holdings and Capital/Fashion into bankruptcy proceedings without Plaintiff's consent.   The filing of bankruptcy triggered a default in the construction loan.  In those proceedings, the Plantation Fashion Mall assets were sold at an auction for a fraction of the $161 million invested and loaned by Plaintiff.  Plaintiff lost the ability to develop the project with competent management, and thereby to recoup its investment.  Defendants' breaches of fiduciary duty therefore proximately caused Plaintiff a loss of no less than $140 million.

Wherefore, Plaintiff demands judgment for damages exceeding $75,000, plus pre-judgment interest, and such further relief as is just and proper.

**(COUNT 1V)**
**(BREACH OF FIDUCIARY DUTY)**
**(Against Anselmo)**

145.    Plaintiff realleges paragraphs 1 through 121.

146.    After leaving B&P, Anselmo continued to have fiduciary duties to Plaintiff.

33

147.    By participating in pre-bankruptcy planning conferences with Chen and others, Anselmo advocated against the interests of Plaintiff, one of her other clients.

148.    By doing so, Anselmo breached her fiduciary duties to Plaintiff.

149.    Anselmo's participation in the decision to place Mapuche, Holdings, and Capital/Fashion into bankruptcy proximately caused Plaintiff damage.  The filing of bankruptcy proceedings triggered a default in the construction loan. In those proceedings, the Plantation Fashion Mall assets were sold at an auction for a fraction of the $161 million invested and loaned by Plaintiff.  Plaintiff lost the ability to develop the project with competent management, and thereby to recoup all or a portion of its investment.  Defendants' malpractice therefore proximately caused Plaintiff a loss of no less than $140 million.

Wherefore, Plaintiff demands entry of Judgment against Defendant Anselmo for damages, plus pre-judgment interest, and such further relief as is just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands trial by jury.


Dated: May 13, 2016

LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP
*Counsel for Plaintiff*
201 S. Biscayne Blvd., 22nd Floor
Miami, Florida  33131-4301
(305) 403-8788 Main
(305) 403-8789 Facsimile


By: */s/ Lawrence A. Kellogg, P.A.*
LAWRENCE A. KELLOGG, P.A.
Florida Bar No. 328601
Primary E-Mail:  lak@lklsg.com
Secondary E-Mail: cod@lklsg.com

1038329